**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

TWANDA SMITH,                                    *

    *Plaintiff,*                                 *CASE NO. 16-CV-03656-RDB

v.                                                       *

RENAL TREATMENT CENTERS-,                 *
MID-ATLANTIC, INC., d/b/a DAVITA
                                                         *

    *Defendant.*
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Twanda Smith ("Ms. Smith") through counsel submits this Memorandum of Law, pursuant to Local Rule 105, in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

### TABLE OF CONTENTS

INTRODUCTION…………………………………………………2

STATEMENT OF FACTS…………………………………………...3

STANDARD OF REVIEW………………………………………….16

SUMMARY OF ARGUMENT……………………………………...17

LEGAL ARGUMENT……………………………………………….18

    THIS COURT SHOULD DENY DAVITA'S MOTION FOR SUMMARY
    JUDGMENT ON MS. SMITH'S CLAIMS OF RACE DISCRIMINATION
    BECAUSE DAVITA HAS NOT MET ITS BURDEN OF SHOWING
    THERE IS NO GENUINE DISPUTE OF MATERIAL FACT…………..18

    Ms. Smith can establish a *prima facie* case of racial discrimination…………..19

Ms. Smith was performing her job at a level that met DaVita's
legitimate expectations……………………………………… 20

Ms. Smith's position remained open following her termination…………….22

DaVita's ostensibly legitimate and non-discriminatory justification for
Ms. Smith's termination is a mere pretext………………………… 23

THIS COURT SHOULD DENY DAVITA'S MOTION FOR SUMMARY
JUDGMENT ON MS. SMITH'S CLAIMS OF RETALIATION BECAUSE
DAVITA HAS NOT MET ITS BURDEN OF SHOWING THERE IS
NO GENUINE DISPUTE OF MATERIAL FACT………………………..27

Ms. Smith can make a *prima facie* case of retaliation because there
is a causal connection between her protected activity and her termination…… 28

DaVita's ostensibly legitimate and non-retaliatory justification for Ms.
Smith's termination is a mere pretext…………………………… ..28

CONCLUSION……………………………………………………… .30

## INTRODUCTION

Defendant Rental Treatment Centers— Mid-Atlantic, Inc. d/b/a DaVita ("DaVita") asks this Court to find its proffered legitimate and non-discriminatory justification for Ms. Smith's termination credible **as a matter of law**.   To grant DaVita's motion, would require this Court to make credibility determinations and to weigh the evidence, each of which is within the province of the jury. As explained more fully below, the record is replete with material inconsistencies, contradictions, and irregularities on critical factual issues. This case cannot be dismissed summarily because the evidence, construed in a light most favorable to Ms. Smith, permits a reasonable jury to find that DaVita discriminated and retaliated against Ms. Smith.

## STATEMENT OF FACTS

### A.    Ms. Smith had an unblemished career with DaVita that spanned close to two decades until she made a series of protected complaints of race discrimination and retaliation.

Beginning in the late 1990's,[1] Ms. Smith began working for DaVita and its predecessors as a Patient Care Technician ("PCT") at clinics across the south and mid-Atlantic. (The deposition of Twanda Smith ("Smith Dep.") is attached as Exhibit 1, at 8:21-19:15). DaVita provides kidney dialysis care at clinics across the country.  As a PCT, Ms. Smith was responsible for operating dialysis machines and caring for patients under the supervision of a nurse.  (Kettell Dep. at 17).   Ms. Smith consistently received good evaluations[2] and was rarely subject to disciplinary action until she made a series of protected complaints of race discrimination and retaliation.[3]

In July 2013, Ms. Smith began working at DaVita's clinic in Chestertown, Maryland to be closer to her home in Delaware.  (Smith Dep. at 19).   At the time, Ms. Smith was the only African American employee working at the Chestertown clinic.  (Smith Dep. at 49).   Shortly after the transfer, Matthew Borsari (White), a PCT, began making derogatory jokes about Ms.

---

[1] According to DaVita's record, Ms. Smith's date of hire is 2001.  (The deposition of Donna Kettell ("Kettell Dep.") is attached as Exhibit 2, at 22:15-20). Prior to 2001, Ms. Smith worked for DaVita's predecessors.

[2] Although DaVita does an annual performance review, (Kettell Dep. at 19-20), DaVita produced only a snapshot of Ms. Smith's evaluations from 2009, in which Ms. Smith was rated as "exceeds expectations," and 2011, in which Ms. Smith was rated as "meets expectations," and Ms. Smith's Professional Development Reviews for the period of August 1, 2013 to July 31, 2014 and August 1, 2014 to July 31, 2015, in which she was rated as "meets expectations." (The performance review snapshot for Ms. Smith is attached as Exhibit 3, Ms. Smith's Professional Development Review for the period of August 1, 2013 to July 31, 2014 is attached as Exhibit 4, and Ms. Smith's Professional Development Review for the period of August 1, 2014 to July 31, 2015 is attached as Exhibit 5).

[3] Despite the many years Ms. Smith worked for DaVita, other than the series of write ups that followed her substantiated complaints of discrimination, she had been disciplined only one other time in 2012.  (Docket No. 16-8 at 2-3).

Smith's race. (Smith Dep. at 29; *see also* DaVita's Report Summary PS-13-02019, summarizing its investigation of Ms. Smith's complaint about Mr. Borsari, which is attached as Exhibit 6). According to Ms. Smith, Mr. Borsari made repeated racially derogatory remarks to her, including referring to her as a "high yellow one," calling her and other African American workers at the Easton clinic "monkeys," and demanding she make him "chocolate milk" by putting her finger in his milk and stirring it up. (Smith Dep. at 29-34).

**B.      In the fall of 2013, Ms. Smith began complaining of race discrimination.**

Ms. Smith verbally complained about Mr. Borsari's offensive behavior to John Rundle (White), the Facility Administrator ("FA") [4] at the Chestertown clinic.  (Smith Dep. at 36).  Mr. Rundle ignored Ms. Smith's verbal complaints (Smith Dep. at 42) and, consequently, Ms. Smith lodged a formal written complaint by email dated November 9, 2013.  (The email from Ms. Smith to Mr. Rundle dated November 9, 2013 is attached as Exhibit 7).  Mr. Rundle then called a meeting with Mr. Borsari and Ms. Smith, at which Mr. Borsari apologized to Ms. Smith.  (Smith Dep. at 39-46).  Ms. Smith did not find Mr. Borsari's apology sincere and, following their meeting, Mr. Borsari taunted Ms. Smith for making the complaint.  (*Id.*).

**C.      Ms. Smith contacts the CEO of DaVita about Mr. Borsari and her complaints of race discrimination were substantiated.**

By email dated November 14, 2013, Ms. Smith forwarded her complaint to Kent Thiry, the CEO of DaVita, whose office was located in Colorado. (Exhibit 7).  DaVita's human resources ("HR") launched an investigation, and its investigative findings substantiated Ms. Smith's allegations.  According to DaVita's records, Mr. Borsari had once served as an FA, but DaVita had demoted him to a PCT because of "performance issues."  (Exhibit 6 at 3-4 and 6).

---

[4] An FA is a supervisor charged with managing both the administrative and clinical sides of a clinic.

At the time Ms. Smith made the complaint about Mr. Borsari, DaVita and Mr. Borsari were involved in litigation "based on comments [Mr. Borsari] made that were offensive in nature." (*Id.*).  As a result of Ms. Smith's complaint, DaVita terminated Mr. Borsari effective January 2, 2014.  (Exhibit 6).

**D.      Ms. Smith is retaliated against at the local level for complaining about Mr. Borsari.**

According to Ms. Smith's performance review covering the period of August 1, 2013 through July 31, 2014, Ms. Smith was a "good PCT," but her communication had caused issues with team dynamics over the last few months.  (Exhibit 4).   Ms. Smith responded to the allegation, claiming the "hostile work [e]nvironment stem[med] from [Mr. Borsari]."  [M]y coworkers are friend[s] with him and they blamed [me] for his termination."  (*Id.*).

Following his termination, Mr. Borsari continued to come into the Chestertown clinic to talk and socialize with his former co-workers.   (Smith Dep. at 51-67).   Ms. Smith felt uncomfortable in the presence of Mr. Borsari and asked Mr. Rundle and Anne Marie Dormody (White), who had replaced Mr. Rundle as FA in 2014, to prohibit Mr. Borsari from coming into the clinic.  (*Id.*).   Mr. Rundle and Ms. Dormody failed to take action and Ms. Smith had to contact HR again before Mr. Borsari was forbidden from coming onto the Chestertown clinic's premises.   (DaVita's Report Summary PS-14-08947 summarizing Ms. Smith's complaints following Mr. Borsari's termination is attached as Exhibit 8).

By email dated December 14, 2014, Ms. Smith initiated a complaint with DaVita's HR.  (The email from Ms. Smith to Valerie.Zolman@davita.com dated December 14, 2014 is attached as Exhibit 9).   Ms. Smith complained that Ms. Dormody and Shirley Sutton, the administrative assistant at the Chestertown clinic, had been retaliating against her because they were friends of Mr. Borsari. (Exhibit 8).  Ms. Smith reported to DaVita that, since making the complaint against

Mr. Borsari, her paychecks, which were disbursed by Ms. Sutton, went missing or were delivered significantly later than her coworkers. (*Id.*). Ms. Smith also reported that her lunch was being thrown in the trash and, consequently, she had started to leave her lunch in her car.[5] (*Id.*).

The impetus for Ms. Smith's December 14, 2014 complaint, however, was a statement made by Ms. Dormody. (Exhibit 9). When Ms. Smith had questioned Ms. Dormody why she had not received her paycheck, Ms. Dormody rolled her eyes and replied, "They are protesting in D.C.," referring to the "Justice for All" march that was ongoing in Washington D.C. (*Id.*; *see also* Smith Dep. at 57). Ms. Smith had not mentioned the march or discussed attending the march and found the comment offensive, particularly in light of the fact Ms. Dormody had rolled her eyes while saying it. (Smith Dep. at 57 and 59). Ms. Dormody did not deny making the comment, but claimed she merely mentioned the march as a possible excuse for the delay in the delivery of Ms. Smith's paycheck. (Exhibit 8).

DaVita accepted Ms. Dormody's explanation, (*id.*), even though it was improbable that only Ms. Smith's paycheck (and not all mail) was delayed because of the protest. Rather than address the underlying racial and retaliatory animus, DaVita encouraged Ms. Smith to switch to direct deposit to avoid any other issues with her checks. (*Id.* at 4). Ms. Smith agreed. Because it was undisputed Mr. Borsari was returning to the Chestertown clinic to visit his former co-workers, DaVita substantiated Ms. Smith's claims and instructed Ms. Dormody and Ms. Sutton that Mr. Borsari could not continue to visit the clinic. (*Id.*).

**E.      Despite the change in leadership at the Chestertown clinic, the discrimination and retaliation continue.**

---

[5] At the time of making the complaint, Ms. Smith had remedied this particular issue on her own by leaving her lunch in her car.

In February 2015, Heather Sconce (White) replaced Ms. Dormody as the FA of the Chestertown clinic.  (*See* Deposition of Heather Sconce ("Sconce Dep."), which is attached as Exhibit 10, at 21:14).  By Ms. Sconce's admission, she did not have any issues with Ms. Smith until the spring of 2015 when an "anonymous complaint" was made against Ms. Smith.  (Sconce Dep. at 27).    According to Ms. Sconce, DaVita's Teammate Relations Representative[6] Donna Kettell made Ms. Sconce aware of the anonymous complaint.  (Sconce Dep. at 31).   DaVita's report of the anonymous complaint goes as follows:  On April 24, 2015, "Teammate A," who wanted to remain anonymous, complained that he/she was having "consistent issues" with Ms. Smith and specifically alleged that Ms. Smith was a "bully" and caused "racist problems" by getting "white people on one side and black people on another just to instigate a fight." (DaVita's Report Summary PS-15-03659, summarizing the anonymous complaint and DaVita's investigation, is attached as Exhibit 11).   Teammate A also complained that Ms. Smith called Ms. Sutton an "old bitch"[7] to Ms. Sutton's face.  (*Id.*).

Ms. Kettell conducted an investigation of the anonymous complaint that spanned more than four (4) months and included her interviewing Ms. Sconce, Ms. Sutton, Stephanie Kline, who was a registered nurse at the Chestertown clinic, and Laura Pyper and Christen Rickerts, both of whom are social workers at the clinic.  (Exhibit 11; *see also* Kettell Dep. at 35-36).  All denied the serious misconduct attributed to Ms. Smith by the anonymous complainant, including Ms. Sutton, who flatly denied that Ms. Smith has called her an "old bitch" to her face.  (Exhibit 11). Ms. Sconce reported to Ms. Kettell that she believed Teammate A may be Amber Gott, a PCT who had recently left the clinic and did not like Ms. Smith because Ms. Smith had

---

[6] Teammate relations is a division of HR.

[7] Coincidentally, Ms. Smith was accused of cursing at Ms. Sconce and calling her the same name, which ultimately led to her termination later that year.  Ms. Smith adamantly denies doing so.

complained about Mr. Borsari.  (Exhibit 11; *see also* Sconce Dep. at 38-39).  Although Teammate A provided a contact number, neither Ms. Kettell nor anyone at DaVita called Teammate A in furtherance of his/her complaint. (*Id.* at 34-35).  Ms. Kettell closed the complaint on September 9, 2015, finding all of the allegations against Ms. Smith as "unsubstantiated." (*Id.* at 39).

While the investigation of the anonymous complaint was pending, Ms. Sconce issued Ms. Smith a verbal written warning on August 6, 2015 ("August 6 Verbal Warning") for an incident that occurred on June 17, 2015 when Ms. Smith had mixed and transferred acid without checking and recording the specific gravity on a dialysis machine.  (The Corrective Action Form for the August 6 Verbal Warning is attached as Exhibit 12).  Prior to issuing the August 6 Verbal Warning, Ms. Sconce met with Ms. Smith on July 14, 2015 to discuss the technical infraction. (*Id.*).  Ms. Sconce also notified Ms. Smith of the anonymous complaint and the specific allegations, which Ms. Smith vehemently denied.  (Smith Dep. at 100:15-101:5).  Ms. Smith told Ms. Sconce that she planned to contact HR about the complaint to which Ms. Sconce replied that corporate "would think [she] was crazy." (*See* The letter from Ms. Smith to Ms. Sconce dated July 22, 2015 in which Ms. Smith summarizes her conversation with Ms. Sconce, which is attached as Exhibit 13).

Following the meeting, Ms. Smith wrote Ms. Sconce to complain that Ms. Sconce had violated company policy by waiting more than two weeks to initiate disciplinary action, and took issue with the fact Ms. Sconce had called her "crazy"[8] for wanting to address the anonymous complaint with DaVita's corporate officials.  (*Id.*).  Ms. Smith contacted HR and advised she had been made aware of the anonymous complaint by Ms. Sconce and protested that the allegations

---

[8] Ms. Sconce denied calling Ms. Smith "crazy" and, instead, claims she asked Ms. Smith "would it look crazy to call Mr. Thiry about an anonymous complaint?"  (Sconce Dep. at 35-36).

lodged against her were untrue.  (Smith Dep. at 100-101).  Although the complaint had been made against Ms. Smith in April, at the time Ms. Smith made the call to HR in July, no one from HR had contacted her about the anonymous complaint.  (*Id.*).

Meanwhile, Ms. Sconce gave Ms. Smith her annual review for the period of August 1, 2014 through July 31, 2015.  Ms. Sconce rated Ms. Smith as "meets expectations."  (Exhibit 5).  In the "teammate comment" section, Ms. Smith noted, "I was told several times during my evaluation that I was doing great and hitting it out [of] the ballpark on several different aspects.  But still I was given 3's which meant average and from my understanding [=]great[,], and [=]hitting it out the ballpark[,] is more than average."  (*Id.*).

On September 30, 2015, Ms. Sconce issued Ms. Smith a written warning ("September 30 Written Warning") for yelling at a charge nurse, being late to work on four occasions, and taking personal calls on the treatment floor.  (The Corrective Action Form for September 30 Written Warning is attached as Exhibit 14).   Ms. Smith admitted to the lateness and taking personal calls, although she explained she did not take more personal calls than any other employee.  (Smith Dep. at 106-11).  Ms. Smith denied the allegation she had yelled at the charge nurse.  (*Id.* at 111).   Interestingly, the September 30 Written Warning came on the heels of DaVita concluding its investigation of the anonymous complaint, in which Ms. Kettell found that Ms. Smith had not bullied or threatened any of her co-workers.

On October 28, 2015, Ms. Sconce held a homeroom meeting with all the employees working at the Chestertown clinic.  (Sconce Dep. at 44-46). At the meeting, Ms. Sconce counseled all employees on cell phone use and arriving on time for their shift, indicating that Ms. Smith was not the only employee with these issues, although Ms. Smith was disciplined for them.  (Ms. Sconce's homeroom meeting notes dated October 28, 2015 are attached as Exhibit

15).  At the meeting, Ms. Sconce also addressed "professionalism;" she instructed everyone to avoid discussing race, sex, politics, and religion on the treatment floor. (*Id.*).

**F.     Ms. Smith complains to DaVita's CEO for a second time.**

On November 1, 2015, Ms. Smith sent an email to Mr. Thiry, DaVita's CEO, requesting an opportunity to speak to him and, at the time, also forwarded to him the complaint she had previously made against Mr. Borsari.  (The email from Ms. Smith to Mr. Thiry dated November 1, 2015 is attached as Exhibit 16).  Shortly thereafter, without any advance notice, Ms. Smith was summoned into a meeting with Tim Greene, DaVita's Regional Operations Director, another DaVita official, and Laura Pyper (White), who is a social worker at the clinic and Ms. Sconce's friend.[9]  (Smith Dep. at 116-18 and 125).  At the meeting, Ms. Smith complained she was working in a hostile environment and cited, as examples, the anonymous complaint, the August 6 Verbal Warning, and September 30 Written Warning. (*Id.* at 120-123).  Ms. Smith also complained that Ms. Sconce had informed Ms. Smith that, the only way she would receive a raise would be to precept new employees and, despite Ms. Smith's repeated requests to precept, Ms. Sconce refused to allow her to do so.  (*Id.* at 121-22).  As a result, Ms. Smith did not receive a raise.  Ms. Smith requested DaVita bring in someone to observe the day-to-day activities at the Chestertown clinic and Mr. Greene denied her request telling Ms. Smith it would be entrapment. (*Id.* at 118-19 and 124-25).

**G.     Ms. Smith is suspended by Ms. Sconce approximately two weeks after making the complaint to DaVita officials.**

As Ms. Smith had feared, she was disciplined shortly after her meeting with Mr. Greene. Ms. Smith was suspended by Ms. Sconce on November 30, 2015 for an incident involving a co-

---

[9] Apparently, Ms. Sconce was aware of the meeting because she had Ms. Pyper sit in on the meeting. (Smith Dep. at 126).

worker on November 25, 2015 ("November 25 Incident"):  A new employee, Anthony Predeoux (African American), had asked Ms. Smith to help him complete a report, referred to as an "AOR," because the temperature on the machine was wrong.  (Smith Dep. at 126-27).  Ms. Smith told Mr. Predeoux to include Patricia Below,[10] the charge nurse (White), on the AOR because Ms. Below had signed off on the machine.  (*Id.* at 132).  Ms. Below refused to be named in the AOR and threatened to throw away the AOR if her name was included.  (*Id.*).  Ms. Smith told Ms. Below that, if Ms. Below threw away the AOR, she was going to report her to Ms. Sconce.  (*Id.* at 133-34).  Ms. Below retorted that Ms. Sconce would not do anything, and Ms. Smith countered that she would call corporate, if Ms. Sconce failed to take any action.  (*Id.*).

Immediately after that exchange, Ms. Below called Ms. Sconce, who was not working at the Chestertown Clinic to complain.[11]  (Sconce Dep. at 70).  Ms. Sconce then called a meeting with Ms. Smith, Ms. Below, and the medical director, Trish Turner.  Ms. Sconce presided over the meeting by telephone.  (*Id.*).  According to Ms. Smith, Ms. Sconce was more concerned that Ms. Smith had warned she would report the infraction to corporate than the fact Ms. Below had threatened to throw away the AOR.  (Smith Dep. at 135).  Ms. Sconce demanded Ms. Smith write a statement of the incident.  (*Id.* at 138).  Ms. Smith was so upset by Ms. Sconce's reaction that she started to have heart palpitations and left work to go to the Emergency Room ("ER").  (*Id.* at 140-41).  Ms. Smith did not write a statement before she left for the ER.  (Sconce Dep. at

---

[10] Earlier in the year, Ms. Below had falsely reported to Ms. Sconce that Ms. Smith was not wearing a mask during the flu season. (Smith Dep. at 128-31).  Policy dictates that, if an employee refuses the flu shot, he or she must wear a mask.  (*Id.* at 129).  Ms. Smith had refused the flu shot, and complied with the policy by wearing the mask.  Ms. Sconce confronted Ms. Smith about not wearing the mask and Ms. Smith had to supply Ms. Sconce with five witnesses to confirm Ms. Smith had been wearing a mask.  (*Id.* at 129-30).

[11] As FA of the Chestertown clinic, Ms. Sconce worked at the clinic one or two days a week. (Sconce Dep. at 26).

73-74).

Ms. Smith took medical leave from work for the next few days.  She was scheduled to work on November 30, 2015.   (Sconce Dep. at 76).  On that day, Ms. Sconce called Ms. Smith and told her not to report to work, as scheduled, but to appear for a meeting later that day. (Smith Dep. at 141). Ms. Smith obliged and found Ms. Sconce and Ms. Pyper present with Mr. Greene participating by phone.  (Sconce Dep. at 86).  According to Ms. Sconce, she counseled Ms. Smith on "appropriate behavior" and said she was being suspended pending an investigation of the November 25 Incident.

According to Ms. Sconce, after consulting with Ms. Kettell, Ms. Sconce had decided to suspend Ms. Smith for one day, (*id.* at 79-80), for her allegedly "aggressive" behavior arising from the November 25 Incident, (*id.* at 71-73).  Ms. Sconce claims that, during their meeting on November 25, Ms. Smith yelled, called Ms. Below a "liar," and interrupted Ms. Sconce while she was speaking on the phone.  (*Id.*).  Ms. Smith denies calling Ms. Below a "liar", but admits she told Ms. Sconce that Ms. Below was lying about the AOR incident. (Smith Dep. at 153).  In fact, Ms. Smith provided Ms. Sconce with a statement from Natalie Morning, a coworker, who observed the November 25 Incident.  According to Ms. Morning, she overheard Ms. Below say she would throw away any AOR done by Ms. Smith.  (The statement written by Natalie Morning dated November 25, 2015 is attached as Exhibit 17).  Ms. Smith further denies interrupting Ms. Sconce or talking over her.  According to Ms. Smith, Ms. Sconce was asking her questions, but interrupting her before she could finish answering.  (Smith Dep. at 153-54).  Ms. Smith respectfully told Ms. Sconce that, since she had asked a question, to please allow her to answer. (*Id*).

Ms. Sconce concluded the meeting on November 30 by asking Ms. Smith to write a

statement about the November 25 Incident.  Ms. Sconce then left the room to allow Ms. Smith time to write a statement.  (Sconce Dep. at 88).  Ms. Smith wrote that she would not be writing a statement on the advice of counsel and made her way to leave the clinic.  As Ms. Smith was leaving the clinic, she waved goodbye to Karen Williams, another co-worker (African American), who was in the breakroom.  (Smith Dep. at 156).  According to Ms. Smith, Ms. Sconce rapidly approached her and told her to leave while grabbing forcefully onto Ms. Smith.  (DaVita's Report Summary PS-15-10516 summarizing Ms. Smith's complaint about her suspension is attached as Exhibit 18 at 4).  Ms. Smith told Ms. Sconce not to grab her and left the building.  (*Id.*).  After leaving, Ms. Smith sent Ms. Sconce a text asking her how long the investigation was going to take. (Sconce Dep. at 92:8-12).

On December 2, 2015, Ms. Sconce called Ms. Smith to inform her she was being terminated.  (Sconce Dep. at 97).  According to Ms. Sconce, Ms. Smith was being terminated for allegedly using profanity and calling Ms. Sconce a "whore" and a "bitch" on November 30 before leaving the clinic.  (DaVita's Termination Documentation Form issued to Ms. Smith is attached as Exhibit 19).  Ms. Smith adamantly denies calling Ms. Sconce any names, using profanity, or otherwise acting inappropriately.  (Smith Dep. at 156-57).  On the day Ms. Smith was fired, she filed a complaint with HR complaining her termination was motivated by racism and in retaliation for her complaints.  (Kettell at 77-80).  DaVita found her complaints unsubstantiated.  (*Id.*).

## H.      Ms. Sconce contrives a reason to terminate Ms. Smith.

According to Ms. Sconce, the following exchange occurred on November 30 before Ms. Smith left the building, all of which is flatly refuted by Ms. Smith:  When Ms. Sconce came around the corner to check on Ms. Smith, whom she had left to write a statement, Ms. Sconce

found Ms. Smith standing at the door to the breakroom talking very loudly to Mr. Predeoux and Ms. Williams saying "fuck her" and "fuck this place." (Sconce Dep. at 89; *see also* Exhibit 19). Ms. Sconce maintains that she then walked up to Ms. Smith and told her this is "inappropriate and you need to go," at which time, Ms. Smith yelled "you're fucking inappropriate.  Fuck you, you fucking bitch whore." (Sconce Dep. at 89-90; *see also* DaVita's Report Summary PS-15-10678, summarizing the alleged interaction between Ms. Sconce and Ms. Smith on November 30, which is attached as Exhibit 20).   Ms. Sconce called Ms. Kettell later that day seeking to terminate Ms. Smith because, according to Ms. Sconce, Ms. Smith had yelled obscenities at her. (Sconce Dep at 94-95).   According to Ms. Sconce, Ms. Kettell replied, "I think you're right." (*Id.* at 94). On the following day, Ms. Sconce made the decision to terminate with Ms. Smith after speaking with Ms. Kettell and Mr. Greene.  (*Id.* at 94-95 and 105).

According to DaVita's records, Ms. Smith denied yelling obscenities at Ms. Sconce, although at the time Ms. Smith gave her account of what had transpired, the decision to terminate her had already been made.  (Exhibit 18 at 4).  Mr. Predeoux and Ms. Williams also denied having a conversation with Ms. Smith before she left the building and reported they did not hear anything because they were wearing their earbuds and listening to music.  (Sconce Dep. at 100; *see also* Exhibit 20 at 3).  Both Mr. Predeoux and Ms. Williams refused to write statements for DaVita.  According to DaVita, Ms. Pyper and Ms. Sutton allegedly wrote statements the day of the event, claiming they overheard Ms. Smith curse at Ms. Sconce and call her names.  (Sconce Dep. 103-04).  Neither Ms. Sconce, nor Ms. Kettell knows who obtained the witness statements, although Ms. Sconce believes she may have obtained the statements.  (Sconce Dep. at 99 and 104) (Kettell Dep. at 77)).   It is clear from Ms. Kettell's documentation that she did not personally speak to Ms. Pyper or Ms. Sutton directly.  (Exhibit 20).  Moreover, DaVita's Report

Summary PS-15-10678 (Exhibit 20) does not identify Ms. Pyper or Ms. Sutton as witnesses by name. Although the Report Summary claims witness statements are attached, no statements are actually attached.

**I.     DaVita's conduct following Ms. Smith's termination casts doubt on Ms. Sconce's claims that Ms. Smith used profanity on November 30.**

Ms. Smith applied for and received unemployment benefits following her termination. At the unemployment hearing, which was taken under oath on February 23, 2016, Ms. Sconce testified that "but for" Ms. Smith's use of profanity, Ms. Smith would have returned to work. (An excerpt transcript of the Maryland Department of Labor, Licensing and Regulation Division of Appeals' unemployment hearing on February 12, 2016 is attached as Exhibit 21). At the hearing, Ms. Sconce made clear that, despite Ms. Smith's series of write ups preceding her termination, none of those led to or contributed to her termination. (*Id.* at 8-9). Ms. Sconce further testified as to her recollection of her alleged exchange with Ms. Smith, but Ms. Sconce did not call Mr. Predeoux as a witness, even though he was working at the clinic on the day of the hearing, and did not offer the statements of either Ms. Pyper or Ms. Sutton. (*Id.* at 13-14).

In discovery, DaVita procured a Declaration from Anthony Predeoux dated April 12, 2017 ("April 12 Declaration"). (The April 12 Declaration is attached as Exhibit 22). According to Mr. Predeoux, he signed the April 12 Declaration because DaVita told him it was consistent with his verbal statement given to DaVita shortly after Ms. Smith's termination and that, if he signed the declaration, he would be "done," which he understood to mean that he would not be subpoenaed. (*See* Declaration of Anthony Predeoux dated April 19, 2017, which is attached as Exhibit 23). On those assurances, Mr. Predeoux signed the April 12 Declaration without fully reading it. (*Id.*).

The April 12 Declaration, as drafted by DaVita, contained the following averments,

which Mr. Predeoux claims are false:

> I saw and heard Ms. Smith shout profanities at Ms. Sconce in the hallway, including "Fuck you," and "whore" and then storm out the back door.

> In a previous verbal statement to a Teammate Relations Representative, I told her that I had heard Ms. Smith yelling in the hallway outside the break room on November 30, 2015, but did not hear exactly what she said because I was busy on my phone and not paying attention. However, I made that statement because I did not want to get involved in any controversy.

(Exhibit 22 at ¶ 6, 8 and Exhibit 23 at ¶¶ 10-11).

Upon learning false statements had been attributed to him in the April 12 Declaration, on April 19, 2017, Mr. Predeoux signed a second declaration to correct the record ("April 19 Declaration"). According to Mr. Predeoux's April 19 Declaration, Mr. Predeoux did not hear Ms. Smith talking loudly, shout any profanities, say "fuck you" or call Ms. Sconce a "whore." (Exhibit 23). Mr. Predeoux explained it was false to say that he initially reported he did not hear the alleged exchange between Ms. Smith and Ms. Sconce because he did not want to get involved in any controversy. (*Id.*). Mr. Predeoux maintains that he has consistently and truthfully maintained that he did not hear or see the alleged exchange between Ms. Smith and Ms. Sconce because he was listening to music on his phone. (*Id.*).

## STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). "If there clearly exist factual issues -that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate." *Derrickson v. Circuit City Stores, Inc.*, 84 F. Supp. 2d 679, 684 (D. Md. 2000) (citing *Anderson,* 477 U.S. at

16

250).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party. *Derrickson*, 84 F. Supp. 2d at 684.  Courts must take special care when considering a motion for summary judgment in an employment discrimination case because õmotive often is the critical issue.ö *Derrickson*, 84 F. Supp. 2d at 684-85; *see also Thornbrough v. Columbus & Greenville Railroad Co.,* 760 F.2d 633, 640-41 (5th Cir.1985) (holding summary judgment is an inappropriate tool for resolving claims of employment discrimination, which involve nebulous questions of motivation and intent. Often, motivation and intent can only be proven through circumstantial evidence; determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore within the province of the factfinder).

## SUMMARY OF ARGUMENT

DaVita contends it can establish conclusively a neutral, non-discriminatory and non-retaliatory reason for Ms. Smithøs termination, based upon what it now characterizes as her poor disciplinary record.  But DaVitaøs contention is untenable:  Ms. Smithøs disciplinary record was impeccable until she made her well-founded complaint of discrimination, and, only thereafter, did she have disciplinary problems.  The grounds for all of which were flimsy and, in any event, disputed.   Moreover, in her deposition testimony and in her testimony at Ms. Smithøs unemployment hearing, Ms. Sconce made it clear she would not have fired Ms. Smith were it not for the misconduct attributed to her by Ms. Sconce during their final interaction on November 30, 2015.

DaVita further contends that, even if the trier of fact ultimately agrees with Ms. Smith

that the misconduct attributed to her by Ms. Sconce did not actually occur, Ms. Smith's termination was based upon a "good faith belief" and, therefore, summary judgment is appropriate.  That contention is preposterous, since Ms. Sconce herself was the person who precipitated Ms. Smith's termination and can in no way claim a "good faith belief" in her own misrepresentations.

For these reasons, the resolution of this case depends upon genuine disputes of material fact, rendering summary judgment inappropriate.

## LEGAL ARGUMENT

## I.   THIS COURT SHOULD DENY DAVITA'S MOTION FOR SUMMARY JUDGMENT ON MS. SMITH'S CLAIMS OF RACE DISCRIMINATION BECAUSE DAVITA HAS NOT MET ITS BURDEN OF SHOWING THERE IS NO GENIUNE DISPUTE OF MATERIAL FACT.

Disposition of Ms. Smith's claims at the summary judgment stage would "intrude on the jury function by substituting [the Court's] own judgment for that of the finder of fact." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 650 (4th Cir. 2002).   In reviewing the evidence in its entirety, Ms. Smith can produce sufficient evidence from which a reasonable jury could find that the DaVita discriminated against her on the basis of her race (and for complaining about it):  First, it is undisputed that Ms. Smith was a victim of discrimination by Mr. Borsari. DaVita terminated Mr. Borsari for his transgressions and his White co-workers blamed Ms. Smith for his termination and retaliated against her by stealing or throwing away her lunch, withholding her paychecks, and making bogus complaints about her.

DaVita claims that, once Ms. Sconce became the FA of the Chestertown clinic in February 2015, Ms. Smith cannot point to any evidence of race-based discrimination.  To the contrary, Ms. Smith points to her disciplinary record, which, in large part, consisted of claims

she was "aggressive" toward White employees.  Ms. Smith pointed out that all of the complaints made against her were by White co-workers and Ms. Sconce, in every instance, sided with the White co-workers and counseled Ms. Smith.   (Smith Dep. at 167-68).   Until Ms. Smith complained about Mr. Borsari, she had been disciplined just once in her fifteen year career with DaVita.   Yet, after her complaint about Mr. Borsari, she was continually "counseled" by Ms. Sconce, particularly about her "aggressive" behavior.   Moreover, Ms. Sconce noted the racial dynamic at the clinic on several occasions.   She reported to Ms. Kettell that she believed the anonymous complaint was made by an employee angry with Mr. Borsari's termination.   In a homeroom meeting on October 28, 2015, Ms. Sconce instructed all employees, among other things, not to discuss race on the treatment floor.

### A.      Ms. Smith can establish a *prima facie* case of racial discrimination.

Ms. Smith asserts claims of race discrimination against DaVita pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"); § 20-606 of the State Government (S.G.) Article of the Maryland Annotated Code; and 42 U.S.C. § 1981 ("§ 1981"),[12] each of which make it unlawful for an employer to discharge or otherwise discriminate against an individual on the basis of his/her race. In the absence of direct evidence of discrimination, which is seldom available in these types of cases, a plaintiff may proceed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and its progeny. *See Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100 (2003) (citation and internal quotations omitted) (holding a plaintiff does not need a "smoking gun" to prove invidious intent, and few plaintiffs will have one. Rather, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.").

---

[12] Ms. Smith addresses her race-based discrimination claims collectively because the law if not the same, is substantially similar.

Pursuant to the *McDonnell Douglas* framework, a plaintiff first must make a *prima facie* case of discrimination.  *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 607 (4th Cir. 1999).  The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory justification for its allegedly discriminatory action. *Id.* Finally, if the employer carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the neutral reasons offered by the employer "were not its true reasons, but were a pretext for discrimination." *Id.*

Under the *McDonnell Douglas* framework, an employee demonstrates a *prima facie* case of race discrimination by showing that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

### i.      Ms. Smith was performing her job at a level that met DaVita's legitimate expectations.

DaVita argues that it is impossible for Ms. Smith to show that she was performing her job at a level that met DaVita's expectation because her employment was "plagued by disciplinary problems." (DaVita's Memorandum at 15).  DaVita's argument is directly refuted by the record and, in turn, casts doubt on the credibility of DaVita.  DaVita's argument fails to address how Ms. Smith worked at DaVita for more than a decade with little to no disciplinary record and, then, following a protected and substantiated complaint of discrimination, was issued a series of disciplinary actions.

Moreover, the disciplinary action preceding Ms. Smith's termination was, in large part, for allegedly "aggressive" behavior, which, even aside from Ms. Smith's denial, a jury could

reasonably find inconsistent with her long-standing employment.[13]   Finally, but most importantly, even if the trier of fact were to assume the truth of the misconduct attributable to Ms. Smith by DaVita leading up to November 30, 2015, Ms. Sconce testified unequivocally at the unemployment hearing that, Ms. Smith's prior corrective action had no bearing on her decision to terminate Ms. Smith.

     Ms. Sconce testified, in pertinent part:

Q.     Had you made any decision to terminate her prior to November 30?

A.     Absolutely not.

Q.     Thank you.  Had the claimant not used the profanity, what were you going to do, if she –

A.     Have her return to - - have her return to work.

Q.     Okay.  So were you going to – when you say return to work, how long were you going to keep her on suspension?

A.     We were going to count Monday as her suspension, and then possibly Tuesday, just depending you know, my availability and Human Relations' availability to get together, review the meeting we had on Monday and then develop the expectations moving forward, so I would say within 24 to 48 hours.

                   * * *

Q.     Yes.  So you were going to allow - - you were going to allow her to work even though she has a prior or past history of what you were talking about, correct?

A.     Yes, absolutely.

(Exhibit 21 at 8-9).

     To establish the third element of the *prima facie* case, Ms. Smith need only show that her performance was of sufficient quality to merit continued employment.  By Ms. Sconce's

---

[13] As for Ms. Smith's last performance review, Ms. Sconce rated her as "meets expectations" and verbally told her she was "hitting it out of the park."

admission, aside from the alleged November 30, 2015 exchange, Ms. Smith's performance merited continued employment.  As for Ms. Sconce's claims that Ms. Smith yelled obscenities at her on November 30, 2015, there is a genuine dispute of fact on this issue.  Because a reasonable jury could find that Ms. Smith did not yell obscenities at Ms. Sconce, as discussed more fully below, there is no other evidence from which DaVita can claim Ms. Smith was not meeting its legitimate expectations.

### ii.       Ms. Smith's position remained opened following her termination.

According to Ms. Sconce, they continued to work at the Chestertown clinic without replacing the position vacated by Ms. Smith for some time.  (Sconce Dep. at 105).  Ms. Sconce testified that, after Ms. Smith's termination, DaVita "lost [Ms.] Williams next" and it was, at that point, she decided to hire someone.  (*Id.* at 105).  Ms. Sconce maintains that she has hired just one PCT following the departures of Ms. Smith and Ms. Williams, and, according to Ms. Sconce, the new hire was an African American.  (*Id.* at 106).  Ms. Sconce made clear, however, that she did hire this particular employee to replace Ms. Smith.  (*Id.* at 105).

DaVita brushes over the fact Ms. Smith's position remained open following her termination and focuses, again, on Ms. Smith's disciplinary history, arguing that Ms. Smith fails to show that other employees who engaged in similar conduct were punished less severely than she.[14]  DaVita's argument misses the mark because, according to Ms. Sconce, Ms. Smith's termination had absolutely nothing to do with her prior corrective actions.  As for the alleged terminable event, Ms. Smith says it did not happen, and Ms. Sconce claims it did.  This is a genuine dispute of material fact to be submitted to the jury.

---

[14] It is important to note that Ms. Sconce called a homeroom meeting on October 28, 2015 to address lateness, cell phone usage, and the need to remain professional at work.  (Exhibit 15). Accordingly, the finder of fact could find that these issues were endemic to the clinic and not isolated to Ms. Smith.

**B.     DaVita's ostensibly legitimate and non-discriminatory justification for Ms. Smith's termination is a mere pretext.**

DaVita maintains that it terminated Ms. Smith for cursing and yelling profanities at Ms. Sconce on November 30.  Ms. Smith vehemently denies engaging in any such misconduct. DaVita mischaracterizes Ms. Smith's denial as "conclusory" and "self-serving" because it claims it is uncorroborated.  Even if Ms. Smith's denial was entirely uncorroborated, which it is not, there is a genuine dispute of material fact as to whether Ms. Smith or Ms. Sconce's version of facts is true.  DaVita is asking this Court to find its proffered legitimate and non-discriminatory reason for Ms. Smith's termination credible *as a matter of law* because Ms. Sconce and two alleged witnesses claim Ms. Smith yelled "fuck you" at Ms. Sconce and called Ms. Sconce a "bitch" and a "whore."  It is for the jury to decide what, if anything, transpired on November 30.

In weighing the evidence, a reasonable juror could find that, to have operated a dialysis machine effectively for twenty (20) years, Ms. Smith necessarily possesses a degree of judgment and self-discipline, not to mention the ability to communicate effectively.  It is irreconcilable with those proven attributes to suppose that, when accused of being "overly aggressive" and "intimidating," she responded by screaming "fuck you" and calling Ms. Sconce, her accuser, a "bitch" and a "whore," and, then, would immediately text Ms. Sconce to ask how long the investigation was going to take.

According to Ms. Sconce, when she came around the corner to check on Ms. Smith writing a statement, she found Ms. Smith standing at the door to the breakroom talking very loudly to Mr. Predeoux and Ms. Williams saying "fuck her" and "fuck this place."  (Sconce Dep. at 89; *see also* Exhibit 19).   Mr. Predeoux denies having a conversation with Ms. Smith and claims he was in the breakroom eating his lunch and wearing earbuds listening to music on his phone.  (Exhibits 20 and 23).  Mr. Predeoux also denies hearing Ms. Smith talking loudly in Ms.

Sconce's office and then in the hallway outside the breakroom.  (Exhibit 23 at ¶10).  Ms. Sconce goes on to say that, as Ms. Smith is yelling these profanities and talking to Ms. Williams and Mr. Predeoux, she walked up to Ms. Smith and told her this is inappropriate and you need to go, at which time, Ms. Smith yelled "you're fucking inappropriate.  Fuck you, you fucking bitch whore."  (Sconce Dep. at 89-90).  Again, Mr. Predeoux avers that he did not hear this alleged exchange, even though he was sitting in the breakroom, because he was listening to music.  (Exhibit 23 at ¶ 11; *see also* Exhibit 20).  Yet, Ms. Sutton, who was sitting in her office and Ms. Pyper, who was down the hall, allegedly heard the entire exchange because Ms. Smith was yelling so loud.

According to DaVita, Ms. Pyper and Ms. Sutton supplied witness statements dated November 30, 2015 supportive of Ms. Sconce's claims.[15]  However, neither Ms. Sconce, nor Ms. Kettell knows who obtained the witness statements, although Ms. Sconce believes it may have been her.  (Sconce Dep. at 99 and 104 and Kettell Dep. at 77).  In looking at DaVita's Report Summary PS-15-10678 regarding Ms. Smith's termination, it does not identify Ms. Pyper or Ms. Sutton as witnesses by name. (Exhibit 20).  Although DaVita's Report Summary claims witness statements are attached, none are actually attached.  (*Id.*).  Despite allegedly having witness statements from Ms. Pyper and Ms. Sutton as of November 30, 2015, DaVita did not offer either statement at Ms. Smith's unemployment hearing in February 2016.

DaVita's conduct in procuring the April 12 Declaration from Anthony Predeoux casts further doubt on DaVita's defense.  According to Mr. Predeoux, DaVita asked Mr. Predeoux to sign a declaration, telling him it was consistent with his previous verbal statement and that, if he

---

[15] It is interesting that the statements DaVita procured were from Ms. Pyper, who, Ms. Smith claims is Ms. Sconce's friend, and Ms. Sutton, who, Ms. Smith claims withheld her paychecks because she was upset about Mr. Borsari's termination.

signed the declaration, he would be "done," which he understood to mean that he would not be subpoenaed.  (Exhibit 23).  On those assurances, Mr. Predeoux signed the April 12 Declaration without fully reading it.  (*Id.*).  Upon learning false statements had been attributed to him in the April 12 Declaration, Mr. Predeoux signed the April 19 Declaration to correct the record.  (*Id.*).

Recognizing the dispute of fact on this critical issue and that a reasonable jury could believe Ms. Smith over Ms. Sconce, DaVita argues that, even if Ms. Smith did not shout obscenities, summary judgment is nonetheless appropriate because Ms. Smith has presented no evidence to challenge the "honesty" of DaVita's belief that Ms. Smith shouted obscenities at Ms. Sconce.  DaVita's argument is misplaced because Ms. Sconce was the "decision maker" in Ms. Smith's termination.  Ms. Sconce testified that she called Ms. Kettell seeking to terminate Ms. Smith and Ms. Kettell replied, "I think you're right."  (Sconce Dep. at 94).  According to Ms. Sconce, the next day, during a telephone call with Ms. Kettell and Mr. Greene, the decision was made to terminate Ms. Smith.  (*Id.* at 95).

As Judge Bredar has explained in *Vicino v. Maryland*, 982 F. Supp. 2d 601, 611 (D. Md. 2013): "In view of the Fourth Circuit's application of *Staub*[16] to Title VII cases in *Young*,[17] a complaining party may demonstrate that discrimination motivated an adverse employment action if (1) the individual with the discriminatory animus ÷possessed such authority as to be viewed as the one principally responsible for the [adverse employment] decision or the actual decisionmaker for the employer,' under *Hill*;[18] or (2) the subordinate with discriminatory

---

[16] *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011).

[17] *Young v. United Parcel Serv., Inc.,* 707 F.3d 437, 448–49 (4th Cir. 2013), *vacated and remanded*, 135 S. Ct. 1338, 191 L. Ed. 2d 279 (2015), and *opinion amended and superseded*, 784 F.3d 192 (4th Cir. 2015).

[18] *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004).

animus *intended* to influence the person with decisionmaking authority and was a proximate cause of the ultimate adverse employment action, under *Staub.*" (emphasis in original) (citing *Young,* 707 F.3d at 449); *accord Ridgell v. Colvin,* No. DKC–10–3280, 2013 WL 952253, *12 (D. Md. Mar. 11, 2013)).  Accordingly, even if Ms. Sconce spoke to Ms. Kettell or anyone else for that matter, Ms. Sconce was the "decision maker" because she influenced the decision and was principally responsible for the decision.  Because Ms. Sconce herself was the person who precipitated Ms. Smith's termination, she cannot claim a "good faith belief" in her own misrepresentations.

Moreover, DaVita conducted no real investigation before terminating Ms. Smith. According to Ms. Sconce, the decision to terminate Ms. Smith was made on December 1 after talking to Ms. Kettell.  (Sconce Dep. at 94).  Comparing and contrasting the investigation of the anonymous complaint by Ms. Kettell to the "investigation" leading to Ms. Smith's termination is particularly telling.  With respect to the anonymous complaint, Ms. Kettell conducted an investigation that spanned close to five months during which she personally interviewed many witnesses.  With respect to the "investigation" of the incident that led to Ms. Smith's termination, Ms. Kettell did not conduct any interviews herself.  (Exhibit 20).

Ms. Kettell's teammates, TMRs Cindy Mallen and Lorraine Mercurio, who did <u>not</u> participate in the decision to terminate Ms. Smith, spoke to Ms. Smith on December 1, 2015. (Exhibit 18).  The reason Ms. Mallen and Ms. Mercurio spoke to Ms. Smith was because, on November 25, Ms. Smith had called HR to complain that Ms. Sconce was not taking her concerns about the November 25 Incident seriously.  (*Id.*). During their conversation, they made Ms. Smith aware of her alleged statements to Ms. Sconce, which Ms. Smith denied. (*Id.* at 4). Ms. Mallen and Ms. Mercurio then spoke to Ms. Kettell, the following day, on December 2,

which, according to Ms. Sconce, was after the decision to terminate Ms. Smith had been made. (*Id.* at 5).

If the trier of fact finds that Ms. Smith did not yell obscenities at Ms. Sconce, it would be impossible for the jury to then find that DaVita honesty believed Ms. Smith deserved to be discharged. If a jury believes Ms. Smith over Ms. Sconce, it necessarily means that Ms. Sconce misrepresented the events that transpired on November 30. Because Ms. Sconce herself was the person who precipitated Ms. Smith's termination, she cannot claim a "good faith belief" in her own misrepresentations. For this reason, DaVita's motion for summary judgment should be denied and the case should proceed to trial.

## II.     THIS COURT SHOULD DENY DAVITA'S MOTION FOR SUMMARY JUDGMENT ON MS. SMITH'S CLAIMS OF RETALIATION BECAUSE DAVITA HAS NOT MET ITS BURDEN OF SHOWING THERE IS NO GENIUNE DISPUTE OF MATERIAL FACT.

Ms. Smith brings her retaliation claims under Title VII and S.G. § 20-606(f). To state a claim for retaliation under either statute, Ms. Smith must show (1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) the protected activity and the adverse action were causally connected. *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 218 (4th Cir. 2007); *Taylor v. Giant of Maryland, LLC*, 423 Md. 628, 658 (2011). Title VII and S.G. § 20-606, however, differ in one material respect: Under S. G. § 20-606, Ms. Smith's burden is to show only that retaliation was a "motivating factor" in the adverse employment action. *C.f. Univ. of Tex. Southwestern Med. Ctr. V. Nassar*, 133 S. Ct. 2517 (2013) (holding that, under Title VII, a plaintiff must show his or her protected activity was the "but for" cause of the adverse employment action). In *Taylor v. Giant of Maryland, LLC*, 423 Md. 628, 658 (2011), the Maryland Court of Appeals confirmed that, in a retaliation case, an employee must merely adduce evidence that her protected activity was a "motivating factor" in an employer's decision

27

to subject her to an adverse employment action, not necessarily the controlling factor.

**A.     Ms. Smith can make a *prima facie* case of retaliation because there is a causal connection between her protected activity and her termination.**

Looking at Ms. Smith's career as a whole, Ms. Smith's disciplinary record was impeccable until she made her well-founded complaint of discrimination, and, only thereafter, did DaVita start to discipline her.   In fact, approximately two weeks before Ms. Sconce suspended Ms. Smith for November 25 Incident, Ms. Smith met with DaVita officials about her complaints against Ms. Sconce.  The temporal proximity between Ms. Smith's termination and her complaints are striking and, overwhelming, when you compare Ms. Smith's employment history before she made the complaint against Mr. Borsari to after she made the complaint.

**B.     DaVita's ostensibly legitimate and non-retaliatory justification for Ms. Smith's termination is a mere pretext.**

For the reasons discussed more fully *supra*, DaVita's legitimate and non-retaliatory reason for Ms. Smith's termination is not worthy of credence because a reasonable jury could find that Ms. Smith did not yell obscenities at Ms. Sconce on November 30 and, if the jury was to make such a finding, it would be impossible for it to also find that DaVita honesty believed Ms. Smith deserved to be discharged.  The "good faith" defense advanced by DaVita is misplaced under these particular factual circumstances because Ms. Sconce was not only an eye-witness to the alleged incident, but also a participant of the alleged exchange.  Ms. Sconce then precipitated the decision to terminate Ms. Smith.  Because Ms. Sconce was principally responsible for the decision to terminate Ms. Smith, she cannot claim a "good faith belief" in her own misrepresentations.

There is sufficient evidence from which a reasonable jury could find that Ms. Smith's complaints were a motivating factor in Ms. Sconce's decision to terminate her, particularly

when, according to Ms. Sconce, the sole reason for Ms. Smith's termination was the alleged verbal exchange on November 30, and there is convincing evidence to suggest it never actually happened.

## **CONCLUSION**

Assessing Ms. Smith's claims of discrimination and retaliation requires weighing the credibility of witnesses and evidence and, therefore, is inappropriate for disposition on a motion for summary judgment.  Ms. Smith respectfully requests this Court deny DaVita's motion for summary judgment and grant her such other and further relief as the nature of her cause may warrant.

_____/s/_____
ROBIN R. COCKEY, Federal Bar No.02657
ASHLEY A. BOSCHÉ, Federal Bar No. 28800
Cockey, Brennan & Maloney, PC
313 Lemmon Hill Lane
Salisbury, MD 21801
410-546-1750
Fax:  410-546-1811
rrcesq@cbmlawfirm.com
bosche@cbmlawfirm.com
*Attorneys for Plaintiff*
