# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **TWANDA SMITH,** | * | |
| **Plaintiff,** | * | |
| v. | * | **Civil Case No. RDB-16-3656** |
| **RENAL TREATMENT CENTERS -** | * | |
| **MID-ATLANTIC, INC. d/b/a DAVITA,** | | |
| | * | |
| **Defendant.** | | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Twanda Smith ("Ms. Smith" or "Plaintiff") filed this action against the Defendant, Renal Treatment Centers – Mid-Atlantic, Inc. (d/b/a DaVita) (hereinafter "DaVita" or "Defendant"), alleging various racial discrimination claims under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e (Title VII"); § 20-606 of the State Government (S.G.) Article of the Maryland Annotated Code; and 42 U.S.C. § 1981 ("§ 1981"). Plaintiff's Complaint (ECF No. 1) features five counts. Counts I through III allege that DaVita violated Title VII, S.G. § 20-606, and § 1981, respectively, by terminating Plaintiff based upon her race. (Compl. ¶¶ 35-44.) Counts IV and V allege that DaVita violated Title VII and S.G. § 20-606, respectively, by terminating Plaintiff in retaliation for her prior complaints of racial discrimination. (*Id.* §§ 45-49.)

Defendant filed an Answer (ECF No. 5), and the parties conducted discovery. Defendant ultimately filed the currently pending Motion for Summary Judgment (ECF No. 16). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule

105.6. For the reasons stated below, the Defendant's Motion for Summary Judgment (ECF No. 16) is GRANTED.

## BACKGROUND

### I.  Early Employment History

This Court reviews the facts of this case in the light most favorable to the non-moving party. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Defendant DaVita provides kidney dialysis care throughout the United States, with clinics in Easton, Maryland and Chestertown, Maryland. DaVita's corporate predecessor first hired Ms. Smith as a Patient Care Technician ("PCT") in the late 1990's, and she started working at DaVita's Easton clinic in July 2011. (Smith Dep. at 8:21-19:15, Pl. Ex. 1.)

On May 14, 2012, Ms. Smith was disciplined for "unacceptable performance" and excessive lateness. (DaVita Corrective Action Form, Def. Ex. 6.) In terms of performance, she "fail[ed] to properly set-up the machine result[ing] in break-thru of blood into the machine[, which] is a serious over-sight." (*Id.*) The discipline form indicates that the reprimand constituted a "Final Written Warning," and that failure to correct her performance could result in "immediate termination." (*Id.*)

In July 2013, DaVita transferred Ms. Smith, per her request, to the clinic in Chestertown, Maryland so that she could be closer to her home in Delaware. (Smith Dep. at 19, Pl. Ex. 19.) In 2014, Anne Marie Dormody became the Chestertown clinic's top manager, known as the Facility Administrator ("FA"). According to the Defendant, the FA

is "the only employee in the facility who can hire, fire or discipline employees." (Mem. 3, ECF No. 16-1.)

## II.  Prior Complaints of Discrimination

In 2013, another PCT at the Chestertown clinic, Matthew Borsari, who is white, made racially derogatory remarks towards Ms. Smith. According to Smith, Mr. Borsari referred to her as a "high yellow one," called African American workers "monkeys," and demanded she make him "chocolate milk" by stirring his milk with her finger. (Smith Dep. at 29-34, Pl. Ex. 1.) In the fall of 2013, Smith lodged a complaint regarding Mr. Borsari's conduct, and DaVita's human resources ("HR") department substantiated her allegations after an investigation. (DaVita Report Summary PS-13-02019 at 3-4, 6, Pl. Ex. 6). DaVita terminated Mr. Borsari on January 2, 2014. (*Id.*)

On her Professional Development Review ("PDR") report for the year August 2013 through July 2014, manager Heather Sconce noted that Ms. Smith's "communication can lack at times which can cause issues within the team dynamics" and that Smith "[h]as had several conflicts with Teammates" over the last three months. (Pl. Ex. 8, ECF No. 17-6.) In response to her evaluation, Smith commented that the "hostile work [e]nvironment stem[med] from [Mr. Borsari.] [M]y coworkers are friend[s] with him and they blamed [me] for his termination." (*Id.*).

In December 2014, Ms. Smith initiated a complaint with HR alleging that FA Anne Marie Dormody and Shirley Sutton, the administrative assistant, had been retaliating against her because they were friends of Mr. Borsari. (DaVita's Report Summary PS-14-08947, Pl. Ex. 8; Smith's initial email complaint, Pl. Ex. 9). She alleged, in part, that Ms. Sutton was

intentionally delaying her paychecks, and that Ms. Dormody made an offensive remark when Smith had asked about the delay. (Pl. Exhibits 8, 9.) Smith also explained that Mr. Borsari's continued visits to the Chestertown clinic made her uncomfortable. (Pl. Ex. 8.) DaVita investigated the allegations, suggested that Smith switch to direct deposit for processing her paychecks, and prohibited Mr. Borsari from visiting the clinic. (*Id.*)

In February 2015, Heather Sconce, who is white, replaced Anne Marie Dormody as the FA of the Chestertown clinic. (*See* Sconce Dep. at 21:14, Pl. Ex. 10.) In the spring of 2015, Ms. Sconce received an anonymous complaint against Ms. Smith. (*Id.* at 27.) According to DaVita's report, the complaint alleged on April 24, 2015 that he or she was having "consistent issues" with Ms. Smith because Ms. Smith was a "bully" who caused "racist problems" by getting "white people on one side and black people on another just to instigate a fight." (DaVita's Report Summary PS-15-03659, Pl. Ex. 11.) The complaint also alleged that Smith called Ms. Sutton an "old bitch" to her face. (*Id.*) Ms. Sutton denied that Ms. Smith ever made such a comment. (*Id.* at 4.) DaVita closed the complaint on September 9, 2015, finding all the allegations "unsubstantiated." (*Id.* at 8.)

## III. Plaintiff's Performance Issues

On August 6, 2015, Ms. Sconce issued a verbal warning to Ms. Smith for an incident that occurred on June 17, 2015 when Smith had mixed and transferred acid without checking and recording the specific gravity on a dialysis machine. (Corrective Action Form, Pl. Ex. 12.) In Smith's Professional Development Review for the year August 2014 through July 2015, Sconce rated Smith as "meets expectations," but Smith commented, "I was told

several times during my evaluation that I was doing great and hitting it out [of] the ballpark on several different aspects. But still I was given 3's which meant average." (Pl. Ex. 5.)

On September 30, 2015, Ms. Sconce issued a written warning to Ms. Smith for yelling at a nurse, being late four times, and taking personal calls. (Corrective Action Form, Pl. Ex. 14.) Smith denied yelling at the nurse but admitted to the tardiness and personal calls. (Smith Dep. at 106-11, Pl. Ex. 1.) Smith acknowledged, "[m]y behavior and lateness is due to a sleep disorder and mental stress." (Smith Dep. at 107, Pl. Ex. 1; Def. Ex. 6 at DEF000022-24.)

On November 1, 2015, Ms. Smith emailed DaVita's CEO requesting a meeting and attaching her prior complaint against Mr. Borsari. (Pl. Ex. 16.) Sometime later that month, Smith met with Tim Greene (Regional Operations Director), Andy Crish (Division Vice President), and Laura Pyper (in-house social worker), and Smith complained of a hostile work environment, citing the anonymous complaint, Sconce's performance reprimands, and a rejected raise request. (Smith Dep. at 116-18, Pl. Ex. 1.) According to Smith, DaVita declined Smith's request that someone "like her, who understands her" observe the day-to-day activities at the Chestertown clinic. (T. Greene Email 11/25/2015, Def. Ex. 18; Smith Dep. at 118-19 and 124-25, Def. Ex. 2.)

On November 5, 2015, Ms. Sconce told Ms. Smith that she had communicated in an inappropriate and unprofessional manner during a recent team meeting regarding employee phone usage guidelines. (Smith Dep. at 150-51, Def. Ex. 2; DaVita Report Summary PS-15-09847, Def. Ex. 16; DaVita Report Summary PS-15-10678, Def. Ex. 20.) In response, Smith denied having unprofessionally rolled her eyes (Smith Dep. 150, Def. Ex. 2) but defended her tone as "direct" rather than unprofessional (Report PS-15-09847 at 3, Def. Ex. 16).

Plaintiff then told Ms. Sconce that she would "work on" the tone of her communications. (Smith Dep. at 151, Def. Ex. 2.)

## IV. Plaintiff's Suspension and Termination

On November 25, 2015, Anthony Predeoux, a new Patient Care Technician, asked Ms. Smith to help him complete an Adverse Occurrence Report ("AOR") because the temperature on the dialysis machine was wrong. (Smith Dep. at 126-28, Pl Ex. 1.) Smith told Mr. Predeoux to name Patricia ("Trish") Jones[1] on the AOR because Ms. Jones had signed off on the machine. (*Id.* at 132.) Jones, however, refused to be named in the AOR and threatened to throw away the AOR if her name was included. (*Id.*) Jones called Ms. Sconce about the incident, and Sconce then held a meeting with Smith, Jones, and Dr. Christina Turner, the medical director who witnessed the incident. (*Id.* at 134-35; Sconce Dep. at 70, Pl. Ex. 10.) Sconce asserts that during the meeting, Smith yelled, called Ms. Jones a "liar," and interrupted Sconce. (Sconce Dep. at 71-73, Pl. Ex. 10.) Smith denies calling Ms. Jones a "liar," but admits saying that Jones was lying about the AOR incident. (Smith Dep. at 153, Pl. Ex. 1.) Smith further denies interrupting Ms. Sconce or talking over her. (*Id.*) Ms. Sconce asked each employee to write a statement of the incident. (*Id.* at 138; Corrective Action Form, Def. Ex. 6 at DEF000085.)

Ms. Smith was so upset by Ms. Sconce's response that she started to have heart palpitations and left work to go to the local Emergency Room. (*See* Smith Dep. at 140-41, Pl. Ex. 1.) Smith did not write a statement before leaving for the ER. (Sconce Dep. at 73-74, Pl. Ex. 1.) Smith took medical leave for a few days and was scheduled to return to work on

---

[1] According to Ms. Sconce, Trish Jones' name used to be Trish Below before she got married. (Sconce Dep. at 75, ECF No. 16-5.)

November 30, 2015. (*Id.* at 76.) In the meantime, Sconce spoke to Teammate Relations ("TMR") Representative Donna Kettell and decided to suspend Smith for one day due to her "aggressive" behavior surrounding the November 25 AOR incident. (*Id.* at 71-73; 76-80; Kettell Dep. at 68-70, Def. Ex. 4.)

On November 30, 2015, Ms. Sconce called a meeting with Ms. Smith, Laura Pyper, and Tim Greene. (Sconce Dep. at 86.) Sconce informed Smith that she was being suspended pending an investigation of the November 25 incident. (Sconce Dep. at 80, 85, Def. Ex. 3.) Sconce concluded the meeting by reiterating the requirement that Smith write a statement about the November 25 incident. (*Id.* at 85-86.) Sconce left the room to allow Smith time to write the statement. (*Id.* at 88.) Ms. Smith wrote that she would not be writing a statement on the advice of counsel, and she made her way to leave the clinic. (Smith Dep. at 151, 155, Def. Ex. 2.)

As she left the clinic, Ms. Smith contends that she waved goodbye to Karen Williams, a coworker who was in the breakroom. (Smith Dep. at 156, Pl. Ex. 1.) According to Smith, Ms. Sconce then grabbed Smith and told her to leave. (DaVita's Report Summary PS-15-10516 at 4, Pl. Ex. 18.) Smith told Sconce not to grab her and left the building. (*Id.*) Ms. Williams and Mr. Predeoux, who was also in the breakroom, reported hearing yelling but not the exact words. (DaVita Report Summary PS-15-10678 at 3, Pl. Ex. 20.) Both Williams and Predeoux refused to write statements for DaVita. (*Id.*; Sconce Dep. at 100, Pl. Ex. 10.) After leaving, Smith sent Sconce a text message asking her how long the investigation was going to take. (*Id.* at 92.)

DaVita offers a different account of the exchange between Ms. Sconce and Ms. Smith. DaVita recounts that outside the breakroom, Smith was saying loudly, "She is a liar. She doesn't want to listen to anybody. F her. F this place." (*Id.* at 89.) Sconce therefore approached Smith to tell her that her conduct was inappropriate and that she needed to leave the clinic. (*Id.*) Smith responded by shouting a series of profanities at Sconce, including "Fuck you," "bitch," and "whore." (Termination Documentation Form, Pl. Ex. 19; DaVita Report Summary PS-15-10516 at 4, Pl. Ex. 18.) Sconce reports that Smith also tried to elbow her. (Sconce Dep. at 94, Pl. Ex. 10.) According to DaVita, Laura Pyper and Shirley Sutton overheard the exchange and wrote statements that day they heard Plaintiff yell those specific profanities at Sconce. (*See* Sconce Dep. 103-04; Pyper Statement on 11/30/2015, Def. Ex. 20 at DEF000309, ECF No. 16-22; Sutton Statement on 11/30/2015, Def. Ex. 20 at DEF000311, ECF No. 16-22.) Smith has denied using any of these profanities. (Smith Dep. at 157, Pl. Ex. 1.)

Later that day, Ms. Sconce called Donna Kettell to discuss terminating Ms. Smith. (Sconce Dep at 93, Def. Ex. 3.) Sconce reports that she told Ms. Kettell, "I can't have teammates screaming and cursing me in front of other teammates loud enough for other patients to hear, was very aggressive in nature. Again, she tried to elbow me. You know, at this point, I think we're at termination." (*Id.* at 94.) Kettell replied, "I think you're right." (*Id.*) Sometime that day or the next, Sconce decided to terminate Smith after speaking with Ms. Kettell and Mr. Greene. (*Id.* at 94-95 and 105).

On December 2, 2015, Ms. Sconce informed Ms. Smith that she was being

terminated. (*Id.* at 97.) That same day, Smith filed a complaint with HR alleging that her termination was motivated by racism and in retaliation for her complaints. (Kettell Dep. at 77-80, Pl. Ex. 2.) DaVita found these complaints to be unsubstantiated. (*Id.*)

On February 23, 2016, Ms. Sconce testified under oath at Ms. Smith's unemployment benefits hearing before the Maryland Department of Labor. (Hr'g Tr., Pl. Ex. 21, ECF No. 17-23.) Sconce testified that but for Smith's use of profanity, she would have permitted Smith to return to work. (*Id.* at 9.)

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In responding to a properly supported motion for summary judgment, the nonmoving party must identify specific facts showing that there is a genuine issue for trial. *Id.* at 256 (citing Fed. R. Civ. P. 56(e)). These facts need not *be* in admissible form, but rather must be facts that *could be* put in admissible form. *Mallik v. Sebelius*, 964 F. Supp. 2d 531, 546 (D. Md. 2013) (explaining the effect of Fed. R. Civ. P. 56(c)(2)). The burden to identify specific facts is "particularly strong" where the nonmoving party also bears the burden of

proof at trial. *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995). Additionally, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)). The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient. *Anderson*, 477 U.S. at 252. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249–50 (internal citations omitted). In the Fourth Circuit, the trial court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

## DISCUSSION

The Defendant seeks summary judgment in its favor on all of Plaintiff's discrimination and retaliation claims.

## I. Discrimination under Title VII, S.G. § 20-606, and § 1981

The same framework governs Title VII, S.G. § 20-606, and § 1981 claims, so this Court will analyze Counts I through III together. *Perkins v. Kaiser Found. Health Plan of Mid-Atl. States*, 2010 WL 889673, at *3 (D. Md. 2010) (analyzing Title VII and § 1981 claims together) (citing *Lightner v. City of Wilmington,* 545 F.3d 260, 263 (4th Cir. 2008)); *Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 444 (D. Md. 2012) (analyzing Title VII and § 20-606 claims together.)

Under the framework first laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a discrimination claim based on termination may proceed in the absence of direct evidence if the Plaintiff first establishes (1) membership in a protected class; (2) satisfactory

job performance; (3) adverse employment action (i.e., termination); and (4) that the discharge or demotion occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See id.* at 802 n.13 (noting that "the facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof" should be adapted to differing factual situations); *Miles v. Dell, Inc.,* 429 F.3d 480, 488 (4th Cir. 2005); *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 (4th Cir. 1989). The *McDonnell Douglas* framework is not meant to be applied in a "rigid, mechanized or ritualistic manner." *Halperin*, 128 F.3d at 196 (citing *Furnco. Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

If a plaintiff establishes a prima facie case of discrimination, the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for its conduct. *See*, *e.g.*, *Byrd v. The Baltimore Sun Co.*, 279 F. Supp. 2d 662, 669 (D. Md. 2003); *Gibson v. Marjack Co., Inc.*, 718 F. Supp. 2d 649, 656-58 (D. Md. 2010). If the defendant meets this burden of production, the burden shifts back to the plaintiff to prove that the employer's legitimate reason for the adverse action is merely a pretext. *Mereish v Walker*, 359 F.3d 330, at 336 (4ᵗʰ Cir. 2004). A plaintiff can meet this burden in two ways: "either by showing that the [employer's] explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of . . . [the] discrimination." *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Despite shifting *intermediate* burdens under the *McDonnell Douglas* approach, "[t]he *ultimate* burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253 (emphasis added).

In this case, the Defendant asserts that there is no genuine dispute that Plaintiff has failed to establish the second and fourth elements of a prima facie case under the *McDonnell Douglas* framework. (Mem. 15-18, ECF No. 16-1.) Even if this Court finds a genuine dispute as to a prima facie case, Defendant further contends that Plaintiff fails to establish a genuine dispute as to whether DaVita's reasons for terminating the Plaintiff were pretextual, thereby failing to meet her ultimate burden of proving intentional discrimination. (*Id.* 18-28.)

## A. The Plaintiff Fails to Make a Prima Facie Case

The Defendant asserts that this case should not proceed to trial because Plaintiff cannot fulfill the second and fourth elements of a prima facie case of discrimination.

### (1) Job Performance

Regarding the second element, the Plaintiff must show that she was meeting DaVita's legitimate expectations at the time of her termination. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). The Plaintiff's "subjective self-assessments . . . are not sufficient to sustain her burden of showing that she was meeting [her employer's] legitimate expectations." *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 363 (4th Cir. 2005); *see also Villaras v. Geithner*, 2009 WL 3418574, at *9 (D. Md. 2009).

In this case, the Defendant points to the Plaintiff's record of disciplinary issues, including a suspension for an incident just five days before she was terminated. On May 14, 2012, Ms. Smith was disciplined for "unacceptable performance" and excessive lateness. (DaVita Corrective Action Form, Pl. Ex. 6, ECF No. 16-8.) On August 6, 2015, Smith received a verbal warning for improperly transferring acid without checking and recording the specific gravity on a dialysis machine. (Corrective Action Form, Pl. Ex. 12, ECF No. 17-

14.) On September 30, 2015, Ms. Sconce issued a written warning to Smith for yelling at a nurse, being late four times, and taking personal calls. (Corrective Action Form, Pl. Ex. 14, ECF No. 17-16.) On November 5, 2015, Ms. Sconce told Smith that she had communicated in an inappropriate and unprofessional manner during a recent team meeting regarding employee phone usage guidelines. (Smith Dep. at 150-51, Def. Ex. 2; DaVita Report Summary PS-15-09847, Def. Ex. 16; DaVita Report Summary PS-15-10678, Def. Ex. 20.) Smith acknowledged the need to "work on" her communication. (Smith Dep. at 151, Def. Ex. 2.) Most importantly, the Smith's aggressive and unprofessional communication regarding the AOR incident on November 25, 2015 caused DaVita to suspend Smith. (Sconce Dep. at 76-77, Def. Ex. 3; Kettell Dep. at 94-95, Def. Ex. 4.) Smith was informed of her suspension on the same day DaVita began evaluating her ultimate termination. Over the course of these incidents, DaVita clearly communicated that continued unprofessional behavior could result in immediate termination. (*See, e.g.,* Def. Ex. 6 at DEF000023.)

On the other hand, the Smith points to her July 2015 performance review in which Ms. Sconce rated Ms. Smith as "meets expectations" (Pl. Ex. 5) and to Ms. Sconce's comment at that she would have allowed Smith to return from her suspension "but for" the profanities (Pl. Ex. 21 at 8-9).[2]

There is no genuine dispute that DaVita's legitimate expectations were not being met at the time of Plaintiff's termination. This analysis does not turn on the question of Smith's use of profanity. Even if Plaintiff never used the profanities alleged by the Defendant,

---

[2] Plaintiff also argues that prior discrimination by DaVita, which is not the subject of this lawsuit, should somehow excuse all of her performance issues. (Opp'n Mem. at 20.) Plaintiff essentially asks this Court to allow prior discrimination by her employer to excuse – in perpetuity – any performance issue that might warrant a lawful termination. The Plaintiff cites no authority for that proposition.

Plaintiff does not deny yelling at her boss in the workplace. DaVita clearly communicated its expectation that continued unprofessional communication, such as yelling, could result in termination. As a general matter, the company's policy on workplace behavior requires employees "to conduct themselves in an appropriate and professional manner . . . to maintain appropriate, respectful working relationships with one another . . . [, and] work in a cooperative manner with supervisors, managers, [and] teammates." (DaVita's Teammate Policies Handbook at DEF000343-45; Def. Ex. 1.) More specifically, just two months before her termination, Ms. Smith acknowledged the following expectations:

> Twanda will remain professional at all times. Twanda will not yell, speak in a threatening tone or in any manner that could be considered discourteous. . . Any additional occurrences will result in further corrective action up to and including termination.

(Corrective Action Form at 2, Def. Ex. 6.) On November 30, 2015, Plaintiff was suspended for aggressive and unprofessional communications that violated these precise expectations. Plaintiff's satisfactory performance review from July, four months prior, does not answer the question of whether Plaintiff was meeting DaVita's legitimate expectations *at the time of her termination. Holland*, 487 F.3d at 214.

Ms. Sconce's admission that she *hypothetically* would have allowed Plaintiff to continue working had Smith not used profanities, shows merely that Sconce *might* not have terminated Plaintiff *despite* not meeting the company's expectations. This remark from Sconce in no way undermines the active suspension Plaintiff began to serve on the day she yelled at Sconce. Plaintiff cannot be actively suspended and at the same time maintain that she was meeting her employer's legitimate expectations. *See Horne*, 154 F. App'x at 363 (finding that Plaintiff

failed to make prima facie case when undisputed prior acts "could potentially support termination even if [Plaintiff's] employment had not been unsatisfactory").

There is no genuine dispute that – by yelling at her boss in the workplace while actively serving a suspension for unprofessional communication – the Plaintiff has failed to show that she was meeting DaVita's legitimate expectations at the time of her termination. For this reason alone, summary judgment is warranted.

### (2) Circumstantial Inference of Unlawful Discrimination

Even if the Plaintiff were to establish the satisfactory performance element, the Defendant argues that there is no genuine issue as to the fourth element of the *McDonnell Douglas* test, that the discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. The United States Court of Appeals for the Fourth Circuit has explained that "replacement within the protected class gives rise to an inference of non-discrimination with respect to the protected status. The fourth prong requires plaintiffs, as part of their prima facie case, to eliminate this inference of non-discrimination." *Miles v. Dell, Inc.,* 429 F.3d 480, 488 (4th Cir. 2005). In limited situations, a plaintiff may eliminate this inference by offering evidence that (a) the replacement was merely an effort to disguise a discriminatory intent; (b) the replacement decision was made by different decisionmakers; or (c) the replacement was only hired after a significant lapse of time. *Id.* at 486-489 (citing *Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998)). In noting but not applying the time-lapse scenario, the Fourth Circuit in *Brown* cited *Howard v. Roadway Express, Inc.,* 726 F.2d 1529, 1535 (11th Cir. 1984), in which the Eleventh Circuit found that a lapse of eleven months would undermine an inference of non-discriminatory intent at the time of

plaintiff's rejected application. *Howard*, 726 F.2d at 1535. In this case, Plaintiff asks this Court to consider that the position remained open for "some time" (Opp'n Mem. 22 (citing Sconce Dep. at 105).), but the Defendant argues that such a circumstance is not relevant in the termination context.

Given the Fourth Circuit's holding in *Miles* and the explicit flexibility of the *McDonnell Douglas* framework, the fact the positon remained open for some un-identified amount of time is but one circumstance for this Court to consider. In this case, DaVita hired another African-American woman, Tanika Jones, to replace Ms. Smith as a dialysis technician. (Sconce Dep. at 106, Def. Ex. 3.) Under *Miles*, this replacement decision creates an inference of non-discrimination. What's more, Plaintiff does not identify any fellow employees outside her protected class who were not terminated despite a similar pattern of unprofessional behavior. Furthermore, Ms. Sconce made both the decision to fire the Plaintiff and to hire Tanika Jones, and the Plaintiff has not offered evidence that the hiring of Tanika Jones was merely an act of concealment by DaVita. Despite conducting discovery, neither party identifies how long Ms. Smith's position remained unfilled. This murky factual circumstance is but a "scintilla" of evidence that does not overcome the inference of non-discrimination or establish a genuine issue of fact as to the fourth element of prima facie case under *McDonnell Douglas*. For this additional reason, summary judgment is warranted in the Defendant's favor.

### B. Defendant's Non-discriminatory Reason for Terminating Plaintiff

In the alternative, if Plaintiff were to make out a prima facie case, this Court will round out the *McDonnel Douglas* analysis. The next step would be to consider whether the

Defendant has offered a legitimate, non-discriminatory reason for its conduct. *See, e.g., Byrd*, 279 F. Supp. 2d at 669; *Gibson*, 718 F. Supp. 2d at 656-58. The Fourth Circuit has established that poor job performance is "widely recognized as [a] valid, non-discriminatory bas[is] for any adverse employment decision." *Evans* v. *Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996). As discussed above, this Court finds no genuine dispute that Plaintiff's history of performance and behavior issues fell below DaVita's legitimate expectations, which were explicitly acknowledged by the Plaintiff on numerous occasions. The Defendant has met its burden of production in this regard.

### C. Plaintiff Fails to Show Pretext

The next step in the *McDonnell Douglas* analysis is for Plaintiff to identify specific facts showing that the purported non-discriminatory reason is mere pretext. *Mereish*, 359 F.3d at 336. A plaintiff can meet this burden "either by showing that the employer's explanation is "'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of . . . [the] discrimination." *Id.* (quoting *Burdine*, 450 U.S. at 256).

Even if the "formal decisionmaker" does not harbor any discriminatory animus, a plaintiff in the Fourth Circuit may prove a corporation's discriminatory intent in two ways. See *Vicino v. Maryland*, 982 F. Supp. 2d 601, 610 (D. Md. 2013). Under *Hill v. Lockheed Martin Logistics Management, Inc.,* 354 F.3d 277 (4th Cir. 2004) (en banc), *abrogated on other grounds by University of Texas Southwest Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013), a plaintiff may show that "the individual with the discriminatory animus "possessed such authority as to be viewed as the one principally responsible for the [adverse employment] decision or the actual decisionmaker for the employer." *Hill*, 354 F.3d at 291. Alternatively, under *Young v.*

*United Parcel Service*, 707 F.3d 437, 449 (4th Cir. 2013), a plaintiff may show that "the subordinate with discriminatory animus intended to influence the person with decisionmaking authority and was a proximate cause of the ultimate adverse employment action." *Vicino*, 982 F. Supp. 2d at 611.

Defendant argues that this Court should focus on Ms. Kettell as the ultimate decisionmaker, but Plaintiff urges this Court to focus on Ms. Sconce as the decisionmaker under either the *Hill* or the *Young* approach. The Defendant concedes that Ms. Sconce "had authority to fire Smith" (Mem. at 23), which sufficiently shows that she "possessed such authority as to be viewed as the one principally responsible" for Plaintiff's termination. *Hill*, 354 F.3d at 291. Alternatively, under the *Young* approach, Laura Pyper and Shirley Sutton are the relevant subordinates as their witness statements support Ms. Sconce's account about the use of profanity.

### (1) Unworthy of Credence

In *Holland* v. *Washington Homes, Inc.*, 487 F.3d 208 (4th Cir 2007), the Fourth Circuit held that summary judgment "may be appropriate if a 'plaintiff created only a weak issue of fact as to whether the employer's reasons were untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.'" 487 F.3d at 215 (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000)). Courts should therefore consider "the probative value of the proof that the employer's explanation is false." *Holland*, 487 F.3d at 215 (quoting *Reeves*, 530 U.S. at 149). In applying these principles, the *Holland* court affirmed summary judgment in the Defendant's favor because "[a]side from [plaintiff's] denials as to the threats (which we accept as true), nothing in the record

supports an inference that [the decisionmaker's] explanation was pretextual" or that the decisionmaker did not believe plaintiff had threatened another employee. 487 F.3d at 215.

Like in *Holland*, Smith's own denials are the only evidence offered to show that DaVita's non-discriminatory justification for firing Smith is false. Specifically, she denies ever using profanity (Smith Dep. at 157, Pl. Ex. 1.) and therefore asserts that Ms. Sconce's profanity-based justification is not trustworthy. Contrary to the Plaintiff's characterizations, the accounts of Mr. Predeoux and Ms. Williams, who said they could not hear Ms. Smith's words (A. Predeoux Decl. on 4/19/2017, Pl. Ex. 23; DaVita Report Summary PS-15-10678 at 3, Pl. Ex. 20), do not give rise to a reasonable inference that Ms. Smith never used profanity. Not only is the question of profanity a "weak issue of fact," but there is "abundant and uncontroverted" evidence of Ms. Smith's disciplinary issues related to unprofessional communication. *Holland*, 487 F.3d at 215. In other words, Plaintiff's evidence on this point is "merely colorable" and "not significantly probative." *Anderson,* 477 U.S. at 249–50. A reasonable jury could not find that firing Plaintiff for unprofessional behavior was a pretext for unlawful discrimination.

### (2) Circumstantial Evidence of Discrimination

Other than questioning Ms. Sconce's belief as to the profanity and alleging that Sconce's termination decision was discriminatory, the Plaintiff does not offer evidence supporting a reasonable inference that Ms. Sconce, Ms. Pyper, or Ms. Sutton were biased against Plaintiff on account of her race. Ms. Smith has affirmatively opined that Ms. Sconce is not racist because she is married to a black man. (Kettell Dep. at 80, 105 Def. Ex. 2; DaVita Report Summary PS-15-10723 at 2 (DEF000042), Def. Ex. 22.) While Ms. Pyper is

allegedly friends with Ms. Sconce (Opp'n Mem. 24), such a relationship says nothing about any racial bias. In her Opposition Memorandum, Ms. Smith alleges that Sutton "withheld her paychecks because she was upset about Mr. Borsari's termination" (Opp'n Mem. 24 n.15), but this opinion falls short of the "specific facts" required at this stage of litigation. *Anderson*, 477 U.S. at 256. Furthermore, Ms. Sutton defended Ms. Smith when an anonymous complainant accused Ms. Smith of calling Ms. Sutton an "old bitch." (DaVita Report Summary PS-15-03659 at 4; Pl. Ex. 11.) Even if Pyper or Sutton harbored discriminatory animus, there is no evidence to support a reasonable inference that Pyper and Sutton's witness statements regarding profanity "proximate[ly] caus[ed]" Ms. Sconce's own belief in what she experienced firsthand. *Vicino*, 982 F. Supp. 2d at 611 (citing Young, 707 F.3d at 449).

Despite shifting *intermediate* burdens under the *McDonnell Douglas* approach, "[t]he *ultimate* burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253 (emphasis added). Plaintiff's bald accusations do not generate a genuine dispute as to racial bias by any of the three individuals whose accounts of November 30, 2015 supported the termination decision. Plaintiff therefore fails under either the *Hill* (apparent authority) approach or the *Young* (subordinate influence) approach to establish a genuine dispute as to the discriminatory intent of the Defendant corporation, DaVita. Accordingly, this Court grants summary judgment in the Defendant's favor on the discrimination claims, Counts I through III.

## II.    Retaliation under Title VII and S.G. § 20-606

This Court now turns to Counts IV and V, which allege that Defendant violated Title VII and S.G. § 20-606, respectively, by terminating Plaintiff in retaliation for her complaints of racial discrimination. (Compl. ¶¶ 45-49.)[3] A plaintiff may also use the *McDonnell Douglas* burden-shifting approach to prove a retaliation claim. *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 248 (4th Cir. 2000). In order to establish a prima facie case of retaliation, a plaintiff must show that "(1) the employee engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action." *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997); *see also Anderson v. G.D.C., Inc.*, 281 F.3d 452, 458 (4th Cir. 2002). Regarding the third prima facie element, Title VII requires a plaintiff to show "but for" causation, *Univ. of Tex. Southwestern Med. Ctr. V. Nassar*, 133 S. Ct. 2517 (2013), but S. G. § 20-606 only requires a plaintiff to show that retaliation was a "motivating factor" in the adverse employment action. *Taylor v. Giant of Maryland, LLC*, 423 Md. 628, 658 (2011).

The employer may rebut a prima facie case by "showing that there was a legitimate non-discriminatory reason for the adverse action, after which the burden shifts back to the plaintiff to show that those reasons are pretextual." *Munday,* 126 F.3d at 242 (citing *McDonnell Douglas,* 411 U.S. 792; *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985); *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir. 1994)).

The Defendant does not dispute the first two elements of a prima facie retaliation claim. Rather, Defendant contends that Plaintiff has not established a causal connection

---

[3] Plaintiff mentions in passing retaliation in the form of a hostile work environment (*see* Opp'n Mem. at 5, 18) and disciplinary actions (*see* Opp'n Mem. at 20, 28), but the Complaint alleges retaliation based solely upon her termination (Compl. §§ 45-49).

between the protected activity and her ultimate termination. Further, Defendant asserts the Plaintiff has not shown that DaVita's legitimate non-discriminatory reasons for terminating her employment were pretextual.

### A. The Plaintiff Fails to Make a Prima Facie Case

The Defendant asserts that Plaintiff's prima facie case fails because it rests solely on the temporal relationship between her complaint to DaVita's CEO on November 1, 2015 and her December 2, 2015 discharge.[4] To show Defendant's intent when terminating Plaintiff, Plaintiff also points to the increase in DaVita's disciplinary actions after she filed the initial complaint against Mr. Borsari in 2013.

In order for a temporal relationship to support to a reasonable inference of retaliatory causation, the temporal relationship must be "very close." *Pascual v. Lowe's Home Ctrs.*, 193 F. App'x. 229, 233 (4th Cir. 2006) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). In this case, the one-month timeframe alone does not support an inference of causation, especially when Ms. Smith exhibited unprofessional behavior two separate occasions *after* Plaintiff's November 1 complaint and in direct violation of DaVita's prior warnings. Regarding her disciplinary history, Plaintiff identifies no similarly situated employees who received disparate treatment for the same pattern of unprofessional behavior, which she acknowledged was "due to a sleep disorder and mental stress." (Smith Dep. at 107, Pl. Ex. 1; Def. Ex. 6 at DEF000022-24.) This Court has an affirmative obligation to prevent factually unsupported claims from going to trial, *Bouchat*, 346 F.3d at

---

[4] Sometime later that month, Plaintiff met with various DaVita officials and complained more specifically of a hostile work environment, citing the anonymous complaint, Sconce's performance reprimands, and a rejected raise request. (Smith Dep., Pl. Ex. 1.) The parties have not identified the exact date of that meeting, but it was precipitated by Plaintiff's November 1 email.

526, and Plaintiff has not established a genuine dispute as to the requisite causal connection under either Title VII ("but for" causation) or S.G §20-606 ("motivating factor" causation). For this reason alone, summary judgment on Plaintiff's retaliation claims is warranted.

## B. Defendant's Non-discriminatory Reason for Terminating Plaintiff

In the alternative, if Plaintiff were to make out a prima facie case, the Defendant must offer a legitimate, non-discriminatory reason for its conduct. *See, e.g.*, *Byrd*, 279 F. Supp. 2d at 669; *Gibson*, 718 F. Supp. 2d at 656-58. Poor job performance is "widely recognized as [a] valid, non-discriminatory bas[is] for any adverse employment decision." *Evans*, 80 F.3d at 960. As discussed above, this Court finds no genuine dispute that Plaintiff's history of performance issues and unprofessional behavior fell below DaVita's legitimate expectations, which were explicitly acknowledged by Ms. Smith on numerous occasions. The Defendant has met its burden of production in this regard.

## C. Plaintiff Fails to Show Pretext

With the Defendant having established a legitimate, non-discriminatory reason for terminating Plaintiff, the burden shifts back to the Plaintiff to show the reasoning is mere pretext. *Munday,* 126 F.3d at 242. In an attempt to meet this burden with respect to her retaliation claims, Ms. Smith relies again on the disputed nature of her use of profanities on November 30, 2016. For the same reasons articulated above, Smith's unsubstantiated denials are insufficient to generate a genuine issue of material fact. More specifically, under *Holland*, 487 F.3d at 215, the question of profanity is a "weak issue of fact," and there is "abundant and uncontroverted" evidence of Smith's disciplinary issues related to unprofessional communication. A reasonable jury could not find that firing Smith for unprofessional

behavior was a pretext for unlawful retaliation. Accordingly, this Court grants summary judgment in the Defendant's favor on the retaliation claims, Counts IV and V.

## **<u>CONCLUSION</u>**

For the reasons stated above, the Defendant's Motion for Summary Judgment (ECF No. 16) is GRANTED.

A separate Order follows.

Dated: February 20, 2018                    _____/s/_____
                                                       Richard D. Bennett
                                                       United States District Judge